# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No: 4:14-cr-00096-REL-CFB-1 |
| | ) | |
| vs. | ) | |
| | ) | |
| FRANKLIN CLARENCE EDMONDS, II, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **ON MOTION TO SUPPRESS** |
| Defendant. | ) | |
| | ) | |
| | ) | |

Defendant Franklin Clarence Edmonds, II (Edmonds) was charged on August 26, 2014,

in a one-count indictment, with being a felon in possession of a firearm, in violation of 18 U.S.C.

§§ 922(g)(1) and 924(a)(2). The firearms Edmonds is charged with possessing were discovered

during a law enforcement search of a vehicle in which Edmonds was riding as a passenger.[1] On

November 21, 2014, Edmonds filed a Motion to Suppress (ECF No. 37), arguing that the

firearms should be suppressed because their discovery by law enforcement was the product of an

unreasonable search and seizure. On December 5, 2014, the Government filed a Resistance to the

Motion to Suppress (ECF No. 46).[2]

On November 24, 2014, the District Court referred Edmonds' Motion to Suppress to the

undersigned for submission of a Report and Recommendation. *See* 28 U.S.C. § 636(b). The

undersigned held an evidentiary hearing on December 18, 2014. John Beamer represented the

---

[1] Bryan Terrell, the other passenger in the vehicle, was charged on the same indictment as Edmonds. Edmonds and Terrell are jointly charged with possessing the two firearms discovered in the vehicle search in question. Terrell is not a party to the Motion to Suppress.

[2] The Government filed two documents (ECF Nos. 45–46) on December 5, 2014, both docketed as "RESPONSE in Opposition/Resistance" to the Motion to Suppress. The undersigned could find no material difference between these two filings, and will cite only to the most recently filed, ECF Number 46.

Government at the hearing; Ward Rouse appeared on behalf of Edmonds, who also appeared personally. The Motion to Suppress is fully submitted. The undersigned makes the following Findings of Fact, Conclusions of Law, and Recommendation to the Court.

## I. FINDINGS OF FACT

At 7:10 A.M. on July 2, 2014, Iowa State Trooper Corey Champlin stopped a four-door compact sedan for speeding while traveling eastbound on Interstate 80 in Dallas County, Iowa. Champlin observed this car from a stationary position; he was alone in his squad car, sitting in the median of the roadway. Champlin recorded the car's speed three times, twice at eighty-one miles per hour, and once at seventy-nine miles per hour.[3] At the time of the traffic stop, Champlin had been an Iowa State Trooper for approximately eight years. In addition to his training at the law enforcement academy, he received drug interdiction training through various programs, and from observing other troopers performing interdiction stops.

Upon stopping the vehicle, Champlin approached the front passenger-side door, and observed a female driver with two male passengers, one of whom was in the front seat. Champlin asked for the driver's identification and the sedan's registration. The driver, whose name was shown by her Wisconsin driver's license to be Abbey Archer, complied. The sedan's registration indicated to Champlin that it was a rental vehicle, so Champlin asked Archer for the rental paperwork; Archer again complied. Champlin further noticed that the front-seat passenger was not wearing his seat belt, so Champlin requested that passenger's identification. The front-seat passenger presented Champlin a Wisconsin driver's license with the name Franklin Clarence Edmonds. Champlin observed that the interior of the vehicle had two cell phones, several food wrappers, some energy drinks, a cooler, pillows, and blankets in plain view. Champlin asked that

---

[3] No evidence was entered into the record regarding the posted speed limit in the area where Champlin observed the sedan, but Edmonds does not dispute that Champlin had probable cause to initially stop the vehicle.

Archer join him in his patrol car while he checked her and Edmonds' identification. *See* Gov't Ex. 1, Video.[4]

While checking Archer's and Edmonds' identification via radio and his computer, Champlin asked Archer a number of questions about the purpose and destination of their trip. Archer stated that they had been to Council Bluffs, Iowa, for three days to visit her grandfather in the hospital, who had just had a heart attack and was in remission from cancer, and that they were en route back to Madison, Wisconsin, to return the rental vehicle. Archer did not mention visiting any other states. Champlin asked Archer at which hospital she had visited her grandfather. Archer hesitated and said she didn't know, that things had been difficult and frustrating, and that she just wanted to go home. Archer stated that Edmonds was her boyfriend, and that the back-seat passenger was Edmonds' cousin, and that they were with her to provide moral support during this difficult time. Archer admitted to traveling seventy-five miles per hour.

Champlin testified at the evidentiary hearing that, at this point in the stop, he had already become suspicious of the group's travel arrangements. Due to this suspicion, at 7:18 A.M., he left Archer in his patrol car and approached the passenger side of the sedan to return Edmonds' identification and ask Edmonds about the purpose and destination of the group's trip. Edmonds stated that they had been to Denver, Colorado, because he had a meeting with an attorney there. Champlin asked if they had stopped anywhere other than Colorado. Champlin testified that Edmonds did not mention going to Council Bluffs or anything about Archer's grandfather. The

---

[4] Government's Exhibit 1 is a video of the traffic stop and vehicle search at issue. The video is over three hours long, and offers two views of the stop and search: one looking out the front of Champlin's patrol car to the sedan, and the other looking toward the patrol car's passenger compartment. The parties jointly submitted the video *in camera* in advance of the hearing for the Court's convenience. The undersigned watched each view of the entire video. At the hearing, the parties referred to selected portions of the video, and Champlin testified that the time and date stamp was accurate. This Report and Recommendation uses times from the video's time stamp.

back-seat passenger—later identified as Bryan Terrell—did not speak during this exchange. At 7:19 A.M., Champlin returned to his patrol vehicle.

At 7:21 A.M., Champlin stated to Archer that he was going to give Edmonds his citation. Champlin again exited his patrol vehicle and approached the sedan. From the passenger side of the sedan, Champlin explained to Edmonds how to contest or pay his seat belt citation fine. At 7:22 A.M., Champlin asked Edmonds and Terrell where they were traveling to at that time, to which they responded they were returning home. Champlin then asked Edmonds if he was traveling with anything illegal in the sedan. Edmonds said no. Champlin immediately returned to his patrol vehicle.

Still at 7:22 A.M., Champlin issued a speeding citation to Archer. At 7:23 A.M., he told her that she could exit his patrol vehicle and that she was "free to go." Archer exited Champlin's vehicle, and Champlin immediately approached her before she could return to the sedan. Champlin said, "Abbey, hang on a second. Do you care if I ask you a couple more questions?" Archer said, "can it be quick? I'm cold." Champlin then asked Archer again about the trip itinerary, whether the car contained anything illegal, and specifically asked whether they had large sums of money or drugs, including marijuana, cocaine, or methamphetamine. Archer said that they did not. Champlin asked Archer for permission to search the sedan. Archer declined, stating she needed to return the sedan to the rental company that day. Champlin then told Archer that he had suspicions about the group's travel because Archer seemed nervous and Edmonds did not mention Council Bluffs when questioned about their travel itinerary. At 7:24 A.M., Champlin again asked Archer for permission to search the sedan. Archer again declined. Champlin then asked Archer if she would consent to have a dog sniff the sedan's exterior.

Archer stated that she had no criminal record and did not want to wait for a canine unit to arrive. Champlin then ordered Archer to get back into his patrol car.

At 7:25 A.M., Champlin re-approached the sedan, asked for Terrell's identification, and asked if Edmonds and Terrell were responsible for anything in the sedan. Terrell handed his New Jersey driver's license to Champlin, and both Edmonds and Terrell stated that they were not responsible for anything in the car. Champlin returned to his patrol car.

At 7:27 A.M., Champlin called a dispatcher to inquire about Terrell. At 7:28 A.M., Champlin received a radio call stating that Terrell had outstanding arrest warrants in Pennsylvania for driving while under the influence.

At 7:33 A.M., Dallas County Sheriff's Deputy Brent Behnken arrived at the scene of the stop. Behnken served as a canine handler, and was patrolling about five to six miles from Champlin's location with his dog, Kaia, when Champlin requested his assistance via software available onboard their vehicles. No testimony or documentary evidence shows when Champlin requested Behnken's assistance.

Behnken had handled Kaia since May 2014. Behnken testified that Kaia was purchased from Midwest K-9, a business in Runnells, Iowa, that trains dogs in drug detection and sells them to police departments. Midwest K-9 is owned and operated by a former law enforcement officer trained in drug detection. Midwest K-9 trained Kaia for roughly two months. On June 5, 2014, Behnken and Kaia completed a two-week handler course and were certified as a team by Midwest K-9. The certificate of completion for this course states, "Midwest K-9 Detection & Consulting does hereby certify that Brent Behnken & K9 Kaia have been tested under the standards, as set forth by Midwest K-9, and have passed Marijuana, Methamphetamine, Cocaine,

and Heroin Narcotics Detection Certification." Gov't Ex. 16. Kaia and Behnken still work as a K-9 team.

Immediately after Behnken's arrival at the scene of the stop, at 7:34 A.M., Champlin briefed Behnken on his suspicions regarding Archer, Edmonds, and Terrell. At 7:35 A.M., Champlin and Behnken approached the sedan, and ordered Edmonds and Terrell out of the sedan and performed pat-down searches. At 7:37 A.M., Edmonds and Terrell were made to sit on the ground in front of Champlin's patrol vehicle.

At 7:38 A.M., Behnken began walking Kaia around the sedan. Behnken and Kaia circled the sedan approximately four times. At exactly 7:40 A.M., Kaia sat down next to the left rear of the vehicle, near the fuel cap. Behnken testified that sitting down is Kaia's trained "alert" to the presence of narcotics. After the alert, Behnken returned Kaia to his vehicle, and then informed Champlin of the alert.

At 7:41 A.M., Champlin placed Terrell in handcuffs and again seated him in front of the patrol vehicle. At 7:42 A.M., he placed Edmonds in handcuffs, and had Edmonds sit on the hood of the patrol vehicle.

At 7:44 A.M., Champlin and Behnken began hand-searching the sedan's trunk. They found, in different bags in the trunk, packaged marijuana edibles, fifty-one thousand dollars in currency, and the two handguns that are the subject of Edmonds' motion.

## II. DISCUSSION AND ANALYSIS

Edmonds does not contest the validity of the initial vehicle stop. Edmonds argues that (1) the stop was unreasonably prolonged, and its scope exceeded what was necessary to address Archer's speeding violation and his seat belt violation; and (2) the interior search of the vehicle was conducted without a warrant or probable cause.

## A. Duration and Scope of the Vehicle Stop

"The Fourth Amendment protects against unreasonable searches and seizures." *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008) (citing U.S. Const. amend. IV). "A traffic stop constitutes a seizure under the Fourth Amendment." *Id.* (citation omitted). "An officer who observes a violation of the law has probable cause to initiate a traffic stop, and such a stop comports with the Fourth Amendment." *Id.* (citation omitted).

"During a traffic stop, an officer may detain the occupants of the vehicle 'while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation.'" *Id.* (quoting *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir.1999)). "The tasks include 'asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose.'" *Id.* (quoting *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir.2005)). "A constitutionally permissible traffic stop can become unlawful, however, 'if it is prolonged beyond the time reasonably required to complete' its purpose." *Id.* (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "Once an officer has decided to permit a routine traffic offender to depart with a ticket, a warning, or an all clear, the Fourth Amendment applies to limit any subsequent detention or search." *United States v. Alexander*, 448 F.3d 1014, 1016 (8th Cir. 2006) (citing *$404,905.00 in U.S. Currency*, 182 F.3d at 648).

Edmonds does not contest that Champlin's initial stop of the vehicle was supported by probable cause, based on the speed that Archer was driving. But the exterior dog sniff of the vehicle, to which Archer did not consent, occurred after Champlin completed all tasks related to the original vehicle stop.

An exterior dog sniff is not a search that is subject to Fourth Amendment scrutiny, no independent justification is needed for an exterior dog sniff conducted during, or within a *de minimis* period after, a valid traffic stop. *See United States v. Rodriguez*, 741 F.3d 905, 907 (8th Cir. 2014), *cert. granted* 135 S.Ct. 43 (2014) (Supreme Court disposition pending). The Government does not argue that the dog sniff here, completed seventeen minutes after Champlin terminated the initial stop by telling Archer she was free to go, was a *de minimis* intrusion. *Cf. id.* at 907–08 (holding that "seven- or eight-minute delay" for dog sniff did not unreasonably prolong stop, and collecting cases finding *de minimis* delays of two, two, four, and "well under ten" minutes). The Court must therefore determine whether Champlin's continued seizure of Archer, Edmonds, and the rental vehicle was independently justified. *Cf. id.* at 907 ("[A] dog sniff may be the product of an unconstitutional seizure, 'if the traffic stop is unreasonably prolonged before the dog is employed.'").

The Eighth Circuit recognizes two circumstances "when an officer may extend or expand the scope of a traffic stop beyond the original justification for the stop": (1) "if the encounter becomes consensual"; or (2) "if the officer develops reasonable suspicion that other criminal activity is afoot." *Peralez*, 526 F.3d at 1120 (citations omitted). A subject's encounter with law enforcement is consensual if a reasonable person in the subject's position would feel free to leave; i.e., if the subject is not seized. *See United States v. Morgan*, 270 F.3d 625, 630 (8th Cir. 2001). "Whether an officer has reasonable suspicion to expand the scope of a stop is determined by looking at 'the totality of the circumstances, in light of the officer's experience.'" *Sanchez*, 417 F.3d at 975 (quoting *United States v. Carrate*, 122 F.3d 666, 668 (8th Cir.1997)).

The Government asserts that Champlin "re-approached" Archer, and that she consented to continue interacting with him after he told her that she was free to go. *See* Gov't Br. at 7, ECF

No. 46. Regardless of whether Archer may have consented to a continued exchange with Champlin, a reasonable person in her position would undoubtedly have not felt free to leave when Champlin ordered her back into the patrol vehicle after she declined to wait for a canine sniff. Any consensual encounter that may have occurred between Champlin and Archer would have ended at that point, nine minutes before Behnken arrived with Kaia, and sixteen minutes before Kaia alerted on the sedan.

Any purported consensual encounter (the two minutes, from 7:23 A.M. to 7:25 A.M. outside of the squad car, during which time Archer twice refused permission to search the car) cannot support expansion of the traffic stop to include the time at which Kaia alerted on the sedan. *Cf. United States v. Beck*, 140 F.3d 1129, 1135–36 (8th Cir. 1998) (holding that encounter after issuance of citation was initially consensual, but that officer calling canine unit after defendant's refusal to consent to search initiated seizure). To permissibly continue the stop and seizure under the Fourth Amendment, Champlin must have had a reasonable suspicion of criminal activity beyond Archer's speeding violation.

"Only when an officer develops a reasonable, articulable suspicion that criminal activity is afoot does he have 'justification for a greater intrusion unrelated to the [initial] traffic offense.'" *United States v. Jones*, 269 F.3d 919, 927 (8th Cir. 2001) (quoting *United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir. 1994)). To meet this standard, the officer's suspicion of criminal activity must "be based upon 'particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant [ ] suspicion that a crime [is] being committed.'" *Id.* (quoting *Beck*, 140 F.3d at 1136) (alterations in original). A court making this determination "must look at the totality of the circumstances and not just each independent fact standing alone." *Id.* (citation omitted). "[T]he court may consider any added meaning that certain

conduct might suggest to experienced officers in the field, trained in the observation of criminal activity." *Id.* (citation omitted). The officer's suspicion cannot be "just a mere hunch or based on circumstances which 'describe a very large category of presumably innocent travelers.'" *Id.* (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)).

The Government argues that Champlin had a reasonable suspicion of criminal activity based on his perception of Archer and Edmonds as being nervous during the stop, their inconsistent answers given regarding the trip's destination and purpose, and his perception of the following facts, informed by his training and experience in law enforcement: "the fact that the car was a rental car, the trashed appearance of the car, the fact that the car was travelling faster than the flow of traffic that morning, and the fact that the parties were from different states and travelling cross country together." Gov't Br. at 8.

Edmonds argues that the circumstances Champlin says he found suspicious are entirely innocuous and consistent with innocent travel. Edmonds asserts that there is no evidence that Archer, Edmonds, or Terrell displayed nervousness beyond what innocent travelers would be likely to display when confronted by police. Edmonds also argues that the presence of energy drinks, snacks, a cooler, pillows, blankets, and cell phones did not render the sedan "trashed," "lived-in," or otherwise sufficiently messy to raise reasonable suspicion of criminal activity, or even raise the officer's suspicion that they were on a more extensive trip than one between Madison, Wisconsin and Council Bluffs, Iowa. Finally, Edmonds argues that there are a number of innocent reasons why travelers would provide inconsistent accounts of their travel itinerary.

The undersigned agrees with Edmonds that the Government presented no specific evidence that Archer manifested exceptional nervousness during the stop. A review of the video demonstrates that she did keep up a steady stream of chatter during the time Champlin was doing

the paperwork to process the citations; Champlin categorized this as nervous behavior. Archer displayed no particular physical manifestations of nervousness that could be observed on the video. *Cf. United States v. Riley*, 684 F.3d 758, 763 (8th Cir. 2012) (affirming finding of reasonable suspicion partly because defendant "exhibited undue nervousness in the form of a visibly elevated heart rate, shallow breathing, and repetitive gesticulations, such as 'wiping his face and scratching his head'"). The undersigned finds that, in isolation, the sedan's interior was not messy beyond what might be expected of innocent interstate travel, particularly by three young adults in a rental car, who had been away from home for several days. *Cf. Beck*, 140 F.3d at 1138 (holding that the "mere presence of fast-food wrappers . . . is entirely consistent with innocent travel"). The appearance of the car cannot be viewed in isolation, but must be examined as part of the totality of the circumstances leading to the officer's suspicions about criminal activity.

Edmonds and Archer gave Champlin conflicting statements about the purpose and destination of their present trip. Other objective facts that Champlin testified he viewed as suspicious, in addition to the appearance of the sedan, were Archer's nervousness and inability to recall the name of the hospital she said she had been visiting for the last three days. While these factors are not inherently suggestive of criminal activity, they are more so in light of Archer's and Edmonds' greatly differing statements about their itinerary, and the purpose of their trip. Edmonds' counsel cited *United States v. Jones*, 269 F.3d 919 (8th Cir. 2001), in support of his argument at the hearing that innocent travelers may lie or give inconsistent accounts about their trip itinerary to avoid having undue suspicion cast upon them. In *Jones*, the court held that "[t]here are numerous reasons why an innocent traveler initially would be reluctant to reveal to law enforcement authorities his criminal history; primarily for fear that it would . . . cast[]

unwarranted suspicion upon that person." *Jones*, 269 F.3d at 928. The court also held, however, that "an inconsistent answer regarding past conduct is less suspicious than an inconsistent answer regarding present destination or purpose," the latter of which "casts suspicion and doubt on the nature and legitimacy of the activity being investigated." *Id.* Viewing the totality of the circumstances, the undersigned finds that Champlin had a reasonable suspicion, formed during the initial traffic stop, that the occupants of the sedan were involved in criminal activity.

Edmonds also challenges Champlin's methods during the stop, citing *United States v. Peralez*, 526 F.3d 1115, for the proposition that delaying a routine traffic stop with drug interdiction inquiries violates the Fourth Amendment. Specifically, Edmonds' counsel cross-examined Champlin about whether Champlin needed to make two separate trips from his patrol car to the sedan to return Edmonds' identification, and then to issue Edmonds his seat belt citation. It was on the first of these trips—returning Edmonds' identification—that Champlin asked for Edmonds' account of the purpose for the group's trip.

In *Peralez*, the court concluded that a traffic stop was unconstitutionally prolonged where the detaining officer's "off-topic questions more than doubled the time [the defendant] was detained," and "constituted the bulk of the interaction between the trooper and the van's occupants." *Peralez*, 526 F.3d at 1121. Champlin's first trip to the sedan to return Edmonds' identification lasted from 7:18 A.M. to 7:19 A.M. While returning Edmonds' identification, Champlin asked about the group's travel itinerary, a question Champlin could permissibly ask as part of his routine investigation during the traffic stop. *See id.* at 1119 (citations omitted). On his second trip to the sedan—in which he issued Edmonds' citation—Champlin posed a single question to Edmonds about whether the sedan contained any contraband. Within seconds, Edmonds had answered, and Champlin was returning to his patrol car. Unlike the officer in

*Peralez*, Champlin only minimally extended the stop by returning Edmonds' identification and issuing the citation in two trips rather than one, and only asked Edmonds one question about contraband, taking a matter of seconds. Further, Champlin had ascertained all of the objective facts supporting his reasonable suspicion of criminal activity prior to his second trip to the car to deliver Edmonds' citation. The undersigned finds that any *de minimis* prolonging of the stop by Champlin's methods was not unreasonable in relation to the purpose of the initial stop, and in any event, was supported by a reasonable suspicion of criminal activity.

## B. Validity of the Interior Vehicle Search

The automobile exception to the Fourth Amendment's warrant requirement "permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *United States v. Farnell*, 701 F.3d 256, 264 (8th Cir. 2012) (quoting *United States v. Kennedy*, 427 F.3d 1136, 1140–41 (8th Cir.2005)) (internal quotation marks omitted). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Kennedy*, 427 F.3d at 1141 (citations omitted). "In determining whether an officer had probable cause to search, courts apply a common sense approach and consider all relevant circumstances." *Id.* (citation omitted).

The Government carries the burden of proving that a warrantless search was supported by probable cause. *See United States v. Twiss*, 127 F.3d 771, 775 (8th Cir. 1997) (Gibson, J., dissenting) (citing *Turk v. United States*, 429 F.2d 1327, 1331 (8th Cir. 1970) and *United States v. Marshall*, 986 F.2d 1171, 1173 (8th Cir. 1993)). "Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer

probable cause to believe that there are drugs present." *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007) (citing *United States v. Sundby*, 186 F.3d 873, 875–76 (8th Cir. 1999)).

Edmonds' counsel argued at the hearing that there was no evidence offered about Kaia's reliability, other than the fact that she was certified by Midwest K-9, the company that trained and sold her. In addition, Edmonds' Brief cites a number of cases that point out error rates for drug-sniffing dogs, and others that hold searches justified by dog sniffs unreasonable based on handlers being unduly suggestive to their dogs. Edmonds did not elicit any testimony at the hearing showing how Kaia performed at the time of this search, the method in which she was handled during the search, or any flaws in Midwest K-9's training or certification process.

A dog sniff is sufficiently reliable to itself provide probable cause where "all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 133 S.Ct. 1050, 1058 (2013).

> If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

*See id.* at 1057.

Kaia and Behnken's team certification indicates that they were tested according to Midwest K-9's standards for proficiency in detecting marijuana, cocaine, methamphetamine, and heroin, approximately one month before the traffic stop in question. Although the Government did not offer detailed evidence about Midwest K-9's training, testing, or certification methods, or offer any explanation about what is observed in the video during Kaia's actual performance, or any information about her performance in other searches, the lack of such evidence does not

render the Government's proof of Kaia's reliability insufficient. *See id.*; *see also United States v. Holleman*, 743 F.3d 1152, 1157–58 (8th Cir. 2014) (affirming finding of probable cause based on dog sniff where record showed dog and handler initially certified and annually re-certified through Northern Michigan K-9 school, and dog's field performance record, "to the extent . . . relevant," showed 57% accuracy). Edmonds did not offer any conflicting evidence tending to show that Kaia was not actually tested for proficiency in detecting narcotics, nor any evidence that Behnken was being unduly suggestive to Kaia during her sniff of the vehicle. Once Kaia alerted on the vehicle, a reasonably prudent person in Champlin's and Behnken's position would think that a search of the sedan would reveal evidence of drug trafficking. *See Holleman*, 743 F.3d at 1157–58 (applying standard, and finding that officer's other suspicions prior to dog alert factor into probable cause finding). Champlin and Behnken's search of the vehicle's interior was supported by probable cause.

### III. CONCLUSIONS, RECOMMENDATION, AND ORDER

The Court finds that: (1) the initial vehicle stop was supported by probable cause of a traffic violation; (2) the extension of the vehicle stop to allow for a canine sniff was supported by the officer's reasonable suspicion of criminal activity; and (3) the hand-search of the vehicle's interior was supported by probable cause of drug trafficking, based on the dog's alert to the vehicle. Neither the seizures of Defendant and the vehicle, nor the search of the vehicle were unreasonable. The seizures and search did not violate the Fourth Amendment. The handguns' discovery was not the result of an illegal search or seizure.

IT IS RESPECTFULLY RECOMMENDED that Defendant Franklin Clarence Edmonds, II's Motion to Suppress Evidence (ECF No. 37) should be **denied**.

IT IS ORDERED that the parties have until **January 20, 2015**, to file written objections to this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Crim. P. 59(b)(2). Failure to timely file objections "waives a party's right to review." Fed. R. Crim. P. 59(b)(2).

IT IS SO ORDERED.

Dated this 6th day of January, 2015.

CELESTE F. BREMER
CHIEF UNITED STATES MAGISTRATE JUDGE